Mr. Saunders, you have reserved, out of your 15 minutes, 1 minute for the trust to deal. Okay, I think we're ready to go. Mr. Saunders, may I please report? Good morning, Your Honors. Expert testimony, both in direct examination and cross-examination, fact witnesses both in depositions and in live testimony and cross-examination, technical documents, source code, and videotapes. That was the substantial evidence that supported the jury to rely upon for stocking equivalence finding in this case. Most of that evidence was completely ignored in the analysis of the district court for returning the jury's verdict. The district court focused on... But it recognized that the jury had sufficient evidence, didn't it? It did. It had substantial evidence, but it gave no weight to it and did not do analysis. Instead, it based its analysis on one very small subset of Dr. Selker, NexStep's expert testimony. And that's the last 15, 20 minutes of his testimony that lasted well over 2 hours. And what Dr. Selker talked about... Just to be clear, most of that testimony was about literal infringement, right? That's correct. It's a common problem in infringement testimony with a DOE tag-along. And I think where the district court got it wrong was the scope of the doctrinal equivalence in this case. This is a very, very narrow doctrinal equivalence argument and very simple. It was not a very complex case with respect to doctrinal equivalence. In the lower court, what Comcast's position was, was that it took more than one button push, multiple button pushes. That was not a single action. That's what it comes down to. And for the court to look at the claim language, it was responsive to a single action performed by a user. That's all that was under the doctrinal equivalence. Responsive to a single action performed by a user. So Comcast's position below was there's more than one button push. It's not a single action. Succeeded on that, right? With the jury. Well, not under the doctrinal equivalence. No, literally. Literally, yes. And so what Dr. Selker talked about was you do multiple button pushes, and that's equivalent to a single action. Equated to throwing a baseball. I would equate it more like dialing a phone. Someone says make a phone call. You make a phone call, that's a single action. You may push seven numbers, but it's a local number, or 11 numbers, but it's long distance. It's still a single action. So that's how simple this doctrinal equivalence argument was. And the district court focused on the following steps, the troubleshooting steps. He didn't link that to the troubleshooting steps of the next part of the claim, which is under literal. Literal infringement was not an issue here. This is doctrinal equivalence. So only that one very specific element is all that's under the focus of district courts, JMOL, and this appeal. Now, my understanding of the district court judge's concern, at least one real concern with the DOE presentation below, is that what Dr. Selker needed to do when making the doctrinal equivalence presentation was to now accept the premise that all of those four or five different individual steps are not just steps that amount to a single action, but, in fact, each of those individual steps is an action to itself. And now Dr. Selker needed to explain to the jury why it can be so that four or five different individual actions can somehow be considered insubstantially different from a single action, which is the term that's used in the claim. So why are a multiplicity of actions equivalent to a single action? And that was the concern, that he didn't see any so-called particularized testimony in linking argument to making that presentation. So the concern was there wasn't really an adequate adjustment in now talking about a new theory of infringement, doctrinal equivalence, why now accepting the fact that some of the things that maybe he said the jury wouldn't accept, about four or five steps amounting to a single action, why if they're all individual actions, why that can still, under the doctrinal equivalence, be a single action. So what I just explained there is obviously very subtle, but there's a very real, significant, important purpose behind the rule of particularized testimony and linking argument for doctrinal equivalence purposes. And I think it's because we need to ensure that the plaintiffs are making it clear to the fact finder how your new theory of infringement is different from the former theory of infringement. So could you explain why it is you think the district court got it wrong when he concluded that there wasn't a sufficient, adequate presentation of the new theory above and beyond, you know, making the adjustment away from the former literal infringement theory? And to be clear, the district court didn't articulate nearly as clearly as you did. Okay. It was very vague. At least he said there was no linking argument. Now, what Dr. Steffler talked about was it would be multiple steps to comprise a single action. So when he talked about multiple steps, he talked about, he used baseball analysis. You pick up the baseball, you pull your arm back, you throw it. Those are multiple steps, but they'd still be equivalent to a single action. So he used the word steps instead of multiple actions. But, once again, this is a very simple concept. If picking up a phone or a device and pressing three times as opposed to one time, is that equivalent to a single action? No one disputes if you push it one time, it's a single action. If you push it three times, could that be a single action as well? And I think, once again, this goes back to the focus of relying only on Dr. Steffler's testimony. There was an abundance of evidence because this was a very simple concept, a layperson concept. This is not something that requires the expert testimony involved in some of the software cases or hardware cases that this court has seen. Can I just add, I guess going back to the, is the baseball analogy what Selker used? It was. Right, so one way perhaps of following up on what Judge Chen said might be this, and tell me what you think about it. With the baseball analogy, there may be a number of steps, but the ball gets released just once. What's going on here, and kind of the point of this patent claim, is that with one communication, leaving the user and arriving at the recipient system, a whole lot of things get done that otherwise would take multiple communications. And so it was incumbent on, and that's what the several pushes and buttons are, right? One sends a communication and they answer something else, another sends another communication, is that wrong? In this instance, what was argued down below was logging on to your phone first, logging on to the device was one step. Once you got to the actual application, the app, the Comcast app that was responsible for this, it was one button push. It was a single button. Their defense was, and we put a nice chart in our table on page 9 of the reply brief. What they said was, there was a start the My Account app, log on if necessary, and then you push the button. So they said logging on to the, this was the evidence they put for the jury. Logging on to the app was the single action. Right, but that's still a communication that goes from user to somebody who then has to recognize it and say, okay, you may proceed. It's like logging on to your phone like a Facebook page. It just logs on to the page, and now you open the page itself for your own personal protection. Then we communicate with the back-end servers, which is the next step of the troubleshooting steps. That's when you push the button that says, my assistant. And then that one single button push, that one single action was enough. But the reason we put a doctrine of equivalence in for that one very, very simple phrase was, even if at the very least, even if you count logging on and then pushing the button, that's still equivalent to a single action. So that's where it comes down to. With respect to Judge Shin, when we were, you know, you look at the totality of the evidence in this case, I think that's key here because, you know, even if you don't credit Dr. Zucker with a linking argument, there was other linking arguments. This is not that complex. The simplicity of this makes this case stand out from other cases. The jury had evidence that they could have done their own linking argument, that they could have figured out on their own because this was such a simple concept. We should have videotaped, as Dr. Zucker did, of someone using the app. This is from Comcast's website. This is how you do it. We had technical documents. We had the cross-examination. You saw the cross-examination of the director, Dr. Villasenor. When we said, you push one button, that's a single action. That's a single action. That's correct. So what the real rub came down to was, is logging on to the app, potentially logging on your phone, opening the app itself, and just pushing the button, opening the app. You're not communicating with the servers. You're not doing any type of activity at that point. That's just getting the phone or your app ready to go. Can you move on to damages issues? Yeah. So the damages issue, the district court determined that DABA was granted because the expert just willy-nilly came up with 50% as the initial starting point. That just wasn't the case. The damages expert relied on a considerable amount of factual basis for the case to get the 50%. There was a basis as a starting point. He went through a complete analysis of the size of the parties, the importance of it, the cost savings of not having the truck rolls go out, and he went through a very, very detailed analysis as to where the parties would start the negotiations. So he started at 50-50. So that would be a starting point. Just for clarification, although I don't know whether it makes a difference, did the 50-50 starting point, was that before any consideration of the particulars of the parties, or was there some consideration of the particulars before that? Again, I'm not sure that makes a difference, but I'd like to know. It was after. It was after you looked at who the parties are, the importance of technology, the cost savings amount. It was a very extensive fact-based analysis of the scope of the case. He didn't have a starting point, a numerical starting point, and then as a result of the analysis landed at 50-50. It seemed like he had 50-50 out of the air. He had no starting point at all. He did the analysis first, and then after he finished his analysis, he got to 50-50. Then he did the Georgia suit factors and reduced it down to 60-40. So he did a factual analysis to get to 50-50 first. He had basis. It wasn't just him saying because, you know, that's a good starting point, 50-50. It wasn't arbitrary. It was something that he actually had thought about. He determined that that would be based on the parties. You don't agree that just saying in the absence of any information a good starting point would be 50-50, that that's wrong. And he didn't say that. Okay. To be clear, he didn't. No, but your position is not that there's something wrong with that. No, I'm just saying in this particular instance. We certainly haven't held that. No, exactly. You can start anywhere you want to start, but in this particular instance he had a well-founded foundation to start at 50-50, and then made justice from there. I'll reserve the rest of my time. Okay. Mr. Sondrage. Thank you, Your Honor. So this case should begin, may it please the Court, this case should begin and end with the issues of non-infringement. On the doctrine of equivalence, I think Judge Shen has put his finger on the fundamental starting problem of this analysis. There isn't this argument in the alternative. There isn't the clear identification of what steps are being compared. So as a result, you have testimony that's never grappling with the fact that the multiple button presses are spaced out in time, the screen is changing between them, there are multiple user decisions and different paths that can take place. Is there communication between those pushes, between the user and some responder? Yes, we believe there is in the sense of when you first... I mean a responder off the device. That's right. In that there's communication when you first open the app, there's communication. And then to the cloud, the data on the gateway. And then there's additional communication as you're going through the further steps. So I think that's another issue that's not being grappled with. And then the attempts to... So just to be super clear, every time the user clicks on a button, presses a button, he or she is then interacting with the cloud each time because the cloud is responding with, say, a new page to see on the screen? Yes, yes. That's how it's working. And on that new page, there are different decisions that can be made. The user can go in different paths. So there's no question here that the same results, essentially the same result occurs. No, I would disagree. Dr. Selger's result testimony, the result prong, was, as the district court correctly recognized, untethered from the claimant. His result prong was, this will fix your problem, this will refresh it. The result here... Is that a jury question? Well, no, that isn't a jury question because if he's offering this testimony, if it's saying the result is it will refresh it. But the result here is that it's responsive to a single action. These four particular troubleshooting steps have to take. So you can't come in and say, oh, we wanted to focus on just the single action in isolation. You really can't have a function or result analysis here without tying it together to what's flowing out of that. And the testimony on that, I mean, you're hearing an argument here about sort of one path they were arguing about, the Xfinity assistant. But the testimony, for example, on determining a support center, at appendix 437, that's talking about a different path when you're coming in through sort of selecting your devices. And then the testimony on that, on appendix 438 and 439, the theory of determining a support center there is you're getting a different URL when you go to refresh your device. Except for, aside from the single action question, the jury found that, you know, these different flows perform all these steps of the claim, right? Well, I mean, the jury found no literally. And that's a black box jury. There was a jury ruling under the doctrine of equivalence. But I think this is a classic example, like this court warned in Lear of Siegel, where when you don't have the proper particularized testimony and linking argument, the jury's just put at sea, right? I mean, that... Right, but the doctrine of equivalence case really boiled down to the single action question. That's the lone thing that the plaintiff presented for purposes of doctrine of equivalence. It was just that limitation. Right, and my point is, if you're doing a function-way result analysis of the single action, you can't meaningfully talk about the function of that and the result of that without showing the connection between the single action and what's coming out of it. And so then you'd be grappling with meaningful differences, like troubleshooting steps that are happening, even under their theory, at different points of time, right? One click is communicating, and maybe that's when the buffering's happening. What if we were to assume that... Here's how the jury understood everything. The jury listened to all of Dr Selker's testimony and everybody else's testimony and concluded that Xfinity assistance and a diagnostic check and all of that literally infringes this claim and other claims, except for the single action question. But on the single action question, we think that this multitude of steps that a user does is the equivalent of a single action. And that's how we should understand the jury's line of thinking here. And so then the question boils down to, okay, did the plaintiff put on enough of a case under our rules of doctrinal equivalence to actually create a fact question that can properly go to the jury on that? Right, I think if you're thinking about it in those terms, the answer to the last question is no, it didn't. It puts on a case where it's testimony on the function is I say that's the same function. It's as conclusive as it can get. The testimony on the way isn't really even talking about the way this is done. It's not grappling with trying to explain why multiple button presses is the same. The testimony of the result is taking aim at the wrong thing. And what we're hearing from the opposing counsel today is there are times or there can be times where the facts are so straightforward, non-complex, that maybe you don't need to put on a big new presentation for purposes of doctrinal equivalence for the jury to think about and understand what's at stake on this particular fact question of equivalence for a given limitation. In light of everything that's been presented before, certainly in the context of literal infringement, but nevertheless, they had a whole body of testimony to hear exactly how these products operate and they understood what was at stake in terms of the single user action in the claim. Right, but it's not a matter of putting on a big presentation. It really is the substance of it. There are ways that this can be done efficiently at trial where the expert is giving a particularized testimony and linking argument that is actually connecting up. But, you know, if you think of the Malta case cited on page 39 of the red group, that was handbells, right, for use in church and schools. Far simpler technology than we're even talking about here. But there, when the expert came in and basically said, well, these function like the claimed buttons that you needed to have on the handbells. That was inadequate, and this court said, the jury's left to nothing but its own imagination to try to fill in the gaps. So we have even simpler technology there. And remember, as I said... In this case, there was evidence. I mean, the jury was not left to its own imagination. Well, I'm not sure. I mean, the evidence here for the doctrine of equivalence testimony didn't answer these questions for the jury. I say that's the same function. It didn't answer the question of result. It didn't. I mean, function, way, and result. All the testimony. Function, pure conclusory. I say that's the same function. That alone would kill them. On the way testimony, that's the testimony the district court having fairly characterized as the word satellite. And if you look at that paragraph, it isn't grappling really with the issue of way. It's at the very high level saying you're not having to input information or you're not downloading the machine room inputting information. That's not saying, okay, now here we have multiple presses. I mean, the second you get to a second button press, it's 100% increased. We're not talking about some case where you have a tolerance that you've changed by 5%. It's a giant change. And in this case, for all of these elements to match up with what they're hearing in literal infringement, you're deep into it. You're talking about five button presses in that scenario. And so this isn't something where the jury is given that evidence. And as this court just affirmed last month over the LSI of the Intel case, there's a reason we have these requirements. The doctrine of equivalence is the exception. And this court has long required the particularized testimony and the linking argument to make sure that it stays cabinet. And I think to dispense with that in this case really runs against that whole body of precedent, and even in cases with far simpler technology. Just to complete that thought on the technology, because they have to position this in the function and the results, it's really not as simple as they're talking about. What you're talking about is flowing out of this is the communication with the home gateway that's causing a bunch of things to happen in the cloud. And so to have an expert who is connecting that up so the jury can understand, as opposed to just sort of drawing the inferences from one screen and changing it to another. So we think that the decision is absolutely correct on doctrine of equivalence. If you affirm on that, then you don't need to reach the damages issue or the conditional cross-appeal on Section 101. And so I'm happy to address any of these issues. On damages, I think the thing I would emphasize is what you're hearing here is taking a lot of testimony that was about the Georgia-Pacific factors and about whether you go up or down from a starting point, and repurposing that to try to justify the starting point that came out of nowhere. And the single most telling thing, this is 9410 of the appendix, when our expert called out and said, this starting point's coming out of nowhere, there's no support for this. The response was, absent any other evidence, 50-50 is the logical starting point. What's wrong with that? I genuinely do not understand what's wrong with that. If you have some identified incremental benefits of working together, if you literally have no other information, but you're going to consider a wealth of information, what's wrong with saying, I've got no reason except to start in the middle. And now I'm going to figure out how far off the middle to go. Forget about Georgia-Pacific. I mean, all kinds of facts. We haven't said that. Phrenetics doesn't say that. Phrenetics was about, you can't use the conclusion of Nash's theorem without establishing the premises. Right, but I would switch around. This is worse than Phrenetics. Phrenetics, at least, it's tapping into a broader theoretical framework for why this would be the starting point. And here, it's essentially the Nash bargaining solution without any theory behind it. No, it's not. The point about the Nash bargaining solution was that it said, this is kind of a result that we are going to get to on the set of premises, like any mathematical theorem, that are the premises of the theorem. This is just saying, we've done an elaborate analysis to get to the stage of identifying the incremental benefits that would be somehow or other shared by the two parties, the patent owner and the licensee in the hypothetical negotiation. Now we're going to think about how they're going to share it. And rather than having an undisciplined analysis, we're going to say, we'll start, let's assume we don't know anything about them. So it's in the middle of the table now. Right, I mean, we're going to share it equally and now we're going to consider one is tremendously powerful in terms of bargaining power and one is not. One has all kinds of other alternatives. What were the alternatives that we considered before? I just don't understand what's wrong with saying when you don't know anything about the division of the pie, start by assuming it'll be equal. So when you don't know anything about the division, they really aren't carrying their burden on apportionment here because the base is being determined based on the cost savings of essentially whenever a customer problem is being fixed. And there's no attempt in this analysis to then apportion that and say how is that attributable to this specific patent, this specific way of doing it with the single action as opposed to some patent. Do I misunderstand? Maybe I misconceived the way I'm thinking about this. I thought that this point came in only after, I don't know, the five steps or something of the whole damages analysis and you've gotten to the stage of identifying the incremental benefits attributable to apportionment to the use of the patent. There's no apportionment analysis there. So they went right from this is the base and his assumption from the base is just if your problem's fixed then you've avoided the truck rolls and the other benefits. It hasn't said, tied that to this particular way of fixing the problem as opposed to some other automated troubleshooting or multiple actions. This doesn't sound like a 50-50 question. This sounds like there just hasn't been a comparison to... But then that space is filled. Then it could come in and the next step in the analysis is to say 50-50 is the starting point. So what I'm saying is maybe there are worlds where if you have apportioned properly you could get to 50-50 is the starting point but to say what's wrong with that absent any other evidence to just start with 50-50 the absent any other evidence is going to mean and would have meant in this context that you're skipping the apportionment analysis and so you're having a danger of really inflated royalty awards that are going past that analysis as required. Thank you. Barbara, you have three minutes. Thank you, Your Honor. Three. Thank you. Going back to the damages question. That was never... The apportionment issue was never before the district court. The cost savings is exactly apportioned to what was... The expert determined what would be the cost savings to the party by using this invention. So it's definitely tied to the footprint of the invention already. So apportionment was already there in the cost savings analysis. So it was never before the district court but just for the record. How you got to 50-50 was through a very case-specific analysis. So he actually went above and beyond which just wasn't arbitrary. And so I just wanted to make that clear for the record. Also for the record, there's no evidence... There's nothing in the evidence of record regarding cloud communications during the first or second button pushes that was just not in the case. It just literally came down as simplicity as one... A single action required only a single button push. Their argument, you'll see it in the cross-examination of their witnesses, their experts, and their fact witnesses. And would you say that that's the DOE issue that's been formed? That's it. It's just the tapping. It's just the tapping. And the functionally resolved... We put it in through expert testimony but also it is abundant how this is done through the record. It's there through the testimony of fact witnesses, their expert, our expert. Their expert actually used the word single action. He says, yeah, that would be a single action with just one button push. He actually says that in cross-examination. You have to log on first and that takes it out of the single action realm. So there was abundant evidence. And there is... Just to be clear, I just want to be sure. You said that there is not evidence in the record describing a particular aspect of the accused method. The aspect being whether in the sequence of buttons, the more than one button pushes, there is a communication, I'm just going to call it the cloud, but outside the home, north of the network, with each button? The record doesn't establish that? Not to my memory. What the whole defense was in this case was if you had to push more than one button with more than a single action, it's multiple actions. That's the whole defense. Very limited purpose. So in this particular case, there is an abundance of evidence that shows that as simple as this technology was, Judge Chin got it right, what the jury could have relied on was they understood what was going on here and that one single, very narrow component of single action performed by the user was a user's action. Unless there are any further questions. Thank you, Your Honor. Appreciate it. Yes. Do you have a minute left? Right. Just very quickly, you don't need to reach the cross appeal of your firm on the 09, but if the claims are being stretched to the point where we're talking about multiple actions here, then we really are talking about just taking the steps the user would have been doing in terms of looking at the serial number, conveying this information, and saying automate that. So the more they're stretching this, the worse the Section 101 case. Okay. Thank you. Thank you for your argument.